UNITED STATES DISTRICT COURT     SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| Cameron International Corporation, | § § § | |
| Plaintiff, | § § | |
| versus | § § | Civil Action H-09-513 |
| Precision Castparts Corporation, | § § § | |
| Defendant. | § | |

## Findings of Fact and Conclusions of Law

1. *Facts.*

    Cameron International Corporation bought an Italian subsidiary of Precision Castparts Corporation that manufactured ball valves. Cameron and Precision signed the contract on September 24, 2004.

    Before they closed the deal, Cameron discovered that Precision was late on some of its orders to its customers – in particular a French company, Technip. These orders would carry late-clause damage claims that Cameron would have to pay. On November 28, 2004, Cameron and Precision agreed to allocate responsibility for the late orders. Precision would reimburse Cameron for 60% of the late charges and direct mitigation costs on orders listed in a supplement to the agreement. Cameron would be responsible for the other 40%. The sale closed the next day, November 29, 2004.

    Two years later, Cameron negotiated a settlement with Technip. Precision was interested in the outcome of these negotiations because three of the orders from Technip were covered by the late-charge agreement. Precision's executive vice president, Greg Delaney, insisted that Cameron allocate the settlement between late charges, warranty claims, and other costs, so that Precision would not be paying Cameron's obligations. In the contract, Precision could observe all negotiations between Cameron and Technip about late charges. Although Cameron did not invite Precision to all negotiations, its oversight seems to be the result of misfeasance rather than malfeasance.

On February 11, 2007, Cameron and Technip settled for a lump sum of €800,000, releasing Technip's claims under the "Liquidated Damages clause and other provisions of the contract." At trial, the parties agreed to use $1,000,000 rather than €800,000. Cameron and Technip did not specify the amounts of the settlement's components. Cameron demanded 60% of the settlement and 60% of its mitigation costs from Precision in the summer of 2007. Six months later, Precision tendered $320,430 to Cameron. Precision used several steps to reach this figure:

- First it determined its maximum share of responsibility for Technip's initial demand using the exchange rate from the day of Cameron's settlement. Technip asked for $2,156,295, including late charges and costs. Precision's exposure for late charges in the agreement was up to $1,151,594. It assumed that all of the orders covered in the agreement incurred the maximum penalty. Based on that assumption, it was responsible for $1,151,594 divided by $2,156,296, or 53.405%, of Technip's demand.
- Because Cameron settled for $1,000,000 and did not allocate between late charges and other claims, Precision reasoned that its share of the settlement should be reduced proportionately from its maximum liability; that is 53.405% of $1,000,000, which is $534,050.
- According to the agreement, Precision is responsible for 60% of late charges; 60% of the pro-rated settlement, $534,050, is $320,430.

Cameron rejected Precision's offer within four days. Cameron says that it is entitled to 60% of the entire settlement and 60% of its mitigation costs.

2.   *Choice of Law.*

Cameron says that the letter agreement is separate from the purchase contract. While the purchase contract chooses Delaware law, the letter does not specify which state's law governs it. By separating the letter from the deal, Cameron hopes to apply Texas law. There is no significant difference between the two states' contract laws on this set of facts, but Texas law permits the prevailing party to recover attorneys fees while Delaware law does not.

The letter is not separate from the purchase contract. The deal closed the day after the letter was signed. No sale would have occurred without allocating the late charges. The letter was integral, not ancillary, to the deal's closing. It operated only within the framework of the purchase contract. The absence of a choice-of-law clause in the letter cannot be a purposeful

exclusion when the document itself has no meaning independent of the purchase contract. Delaware law applies to both documents because they embody a single deal.

3. *The Cap.*

Exhibit A is a supplement to the letter agreement. It caps Precision's liability to three orders with Technip – its inclusion in the letter agreement serves no other purpose. The agreement says:

> The parties acknowledge that the following orders may subject Ball Valves to a claim for liquidated damages due to anticipated delivery of ordered products after the date on which liquidated damages would accrue according to the terms of the orders listed on Exhibit A attached hereto (the "Orders"): If a claim for liquidated damages is made against Ball Valves pursuant to the terms of the Orders, PCC agrees that it will reimburse Buyer or its designated affiliate 60% of the liquidated damages paid . . . .

The contract defines *orders* as those on Exhibit A. It then says that Precision will pay 60% of the late charges on those *orders*, not all orders. There is no plausible alternate reading.

4. *Mitigation.*

In its demand letter, Cameron included three types of expenses that it says are covered by the agreement. These include:

- €132,249 for hiring extra staff for testing and assembly, consultants for speeding up the project, and sending a supervisor to the site;
- $40,000 of warranty repairs; and
- £22,362 (U.K.) in expediting and sending another supervisor to the site.

The agreement says that Precision would pay 60% of Cameron's direct costs of mitigation. It excluded costs incurred in the ordinary course of business.

Many of Cameron's supporting invoices are dated long after the maximum late-charge penalty had been reached. At that point, Cameron was not mitigating late fees – it was resuscitating its relationship with Technip. The agreement prohibits "account maintenance" when it says that the liquidated damages should be reduced "without regard to future orders that may be placed by the claimant." Cameron cannot recover these costs from Precision.

5. *Allocation.*

   A. *Proportional Indemnity.*

Delaware law recognizes that one's proportion of fault should equitably reduce settlements. *Delle Donne & Assoc., LLP v. Millar Elevator Serv. Co.*, 840 A.2d 1244 (Del. 2004).

In that case, a woman was injured while in an elevator. Delle Donne owned the building and Millar installed and maintained the elevator. The defendants settled with the woman for a total of $175,000. Millar had settled for $80,000.

At trial for indemnity and contribution by Millar against Delle Donne, the jury awarded the woman an advisory verdict of $900,000. The jury found that Delle Donne was 65% liable and Millar was 35% liable. The court then found that Millar was entitled to $18,750 in contractual indemnity from Delle Donne. Millar owed 35% of $175,000, or $61,250; by settling for $80,000, it had paid more than its share. *Id.* at 1254.

On appeal, Delle Donne argued that Millar was responsible for 35% of the jury's advisory award of $900,000, or $315,000 – not the settlement amount of $175,000. Because Millar paid less than $315,000, Delle Donne argued that it did not have to indemnify Millar. The court rejected Delle Donne's argument and held that Millar's overall proportionate liability should be applied to the $175,000 settlement, not the jury award. Delle Donne was obliged to indemnify Millar for the excess that Millar had paid.

Here, we are missing the actual proportions of liability. Precision has estimated its share as the maximum it could owe under the contract divided by Technip's demand. According to this calculation, Precision is 53.405% liable, and 53.405% of the $1,000,000 settlement is $534,050. Precision contracted for 60% of its maximum liability, which is 60% of $534,050, or $320,430.

   B. *Confusion of Claims.*

Alternately, Cameron's lump settlement can be analyzed as a confusion of claims – as if it were goods. When homogeneous goods are mixed, each owner may claim his share. The burden lies on the co-mingler to apportion them; if he cannot, he bears all of the loss. *Humble Oil & Refining Co. v. West*, 508 S.W.2d 812, 818 (Tex. 1974). In that case, the Wests were royalty owners of native gas in an underground formation. Humble determined that the reservoir was nearly depleted in 1969. Without injecting more gas, encroaching salt water would reduce the reservoir's capacity. Humble got permission from the state of Texas to inject gas into the formation in 1970.

The Wests then sued Humble for an accounting of their interest. Humble said that it only had to pay royalties to West until the volume of gas produced from that deposit equaled the volume of reserves that it had measured in 1969. The court held that after the Wests had proved the existence of their royalty interest and had shown commingling by Humble, the burden shifted to Humble to determine the Wests' share with "reasonable certainty," – a legally less-certain way of saying more likely than not. *Id.* at 819; *see also* 2 Jairus Ware Perry, *A Treatise on the Law of Trusts and Trustees* § 821 (6th ed. 1911) and 3 John Norton Pomeroy, Jr., *A Treatise on Equity Jurisprudence* § 1063, 1076 (4th ed. 1911).

Here, Cameron insists that Precision bear 60% of the entire settlement less a small amount of extra orders taken by Cameron after the sale of the business. Because Cameron settled without an allocation, Precision does not know what portion of the settlement corresponds to injuries caused by Cameron or by it. The contract and principles of equity require either an accounting or an adjustment.

C.   *Settlement Credits.*

In Texas, the law disfavors double-recovery for a plaintiff who has been injured by two or more defendants. A plaintiff who has sued several tortfeasors must allocate joint and separate damages between defendants who have settled and those who remain in the lawsuit. If he does not, the law credits the settlement towards the judgment against the remaining defendant. First, the defendant must show the amount of the settlement. Then, the plaintiff must show what portion of the settlement paid joint damages and what portion was unique to the settling defendant. If the plaintiff cannot do this, the whole settlement is credited to the plaintiff's jury verdict against the remaining defendant. *Goose Creek Consol. Indep. Sch. Dist. of Chambers and Harris Counties v. Jarrar's Plumbing, Inc.*, 74 S.W.3d 486, 501 (2002 Tex. App.-Texarkana). Although litigated as a tort, the result is correct as a breach of warranty where the plaintiff school district did not allocate joint and separate damages among settling defendant-contractors. The court credited the whole settlement toward the jury's verdict against the remaining subcontractor, resulting in a take-nothing.

This situation is not identical, but the principle should still apply. Even though Cameron did not recover from Technip, it did reduce its obligation to Technip by settling. It now seeks contractual contribution from Precision based on Technip's pre-settlement demand – which would result in an inequitable, one-sided distribution of savings, if not recovery, to it. Cameron should have to show Precision which part of the settlement was

Cameron's burden and which was Precision's. Cameron is solely responsible for the opacity of its $1,000,000 settlement with Technip.

Technip's claim consisted of three types of damages: (a) liquidated damages from late orders that Precision agreed to share responsibility for; (b) liquidated damages from late orders incurred under Cameron's watch; and (c) other damages not related to lateness. These claims could have been segregated. Cameron chose to conflate these three types of injuries into one payment. Its demanding reimbursement of 60% of the entire settlement deprives Precision of the settlement discount.

At most, Precision was responsible for 53.045% of Technip's demand. Technip then settled for less than its demand. Applying principles from cases on settlement credits, Cameron has the burden of allocating damages. As a party to the settlement with Technip, it is in a better position to do this. Because Cameron did not allocate then – and cannot now – the entire settlement with Technip should be credited towards Cameron's claim against Precision. Because $1,000,000 is greater than the amount Cameron seeks in this suit, this theory would result in a take-nothing. Precision's estimate, however, is supported by the preponderance of the evidence and resolves this accounting problem as accurately as possible.

6.   *Conclusion.*

Under three legal theories – proportional indemnity, confusion of claims, and settlement credits, Cameron had the responsibility to allocate its settlement before seeking contribution from Precision. Instead, it tried to take advantage of the settlement discount. Rather than focusing on the real dispute, it devoted much of its briefing to barely-colorable arguments about choice of law and non-integration solely for the purpose of recovering fees.

Precision has calculated its own contractual apportionment based on the only numbers available to it or to anyone. If Cameron had included Precision in the negotiations as it agreed, all of these problems would have been obviated, which is why Precision put the clause for participation in the contract. Cameron will take $320,430 from Precision. Because Precision had already tendered $320,430 to Cameron promptly, Cameron may not recover pre-judgment interest. Because Delaware law applies to the contract, fees will be borne by the party incurring them.

Signed on January 13, 2010, at Houston, Texas.

Lynn N. Hughes
United States District Judge